**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert R. KRILICH, Defendant-
Appellant.**

No. 71–1678.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1972.

Decided Nov. 28, 1972.

Rehearing Denied Dec. 27, 1972.

342

Anna R. Lavin, Edward J. Calihan, Jr., and Joseph A. Lamendella, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Robert A. Filpi, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and CUMMINGS and SPRECHER, Circuit Judges.

CUMMINGS, Circuit Judge.

In June 1970, a two-count indictment was returned against defendant charging him with income tax offenses. The first count alleged that on his 1963 in-

come tax return he willfully and knowingly made and subscribed statements, verified by a written declaration that they were made under the penalties of perjury, which he did not believe to be true and correct as to every material matter, in that he claimed a net long-term capital gain in the amount of $451,128.88, knowing that the gain was substantially in excess thereof. This was charged to violate 26 U.S.C. § 7206(1).[1]

The second count alleged that he willfully and knowingly attempted to evade income taxes by filing a false and fraudulent 1963 income tax return disclosing taxable income of $97,718.93, with tax due in the amount of $51,978.89, whereas, as he well knew, his taxable income was $246,942.78, with tax due in the amount of $118,858.54. This was said to violate 26 U.S.C. § 7201.[2]

The indictment was based upon defendant's increase of the cost basis of two parcels of real estate sold in 1963 by including in the basis shown in his 1963 income tax return (a) $95,048.84 owed to Berry Electric Contracting Company ("Berry") for work it had done in the construction of the Lawrencewood Shopping Center in Niles, Illinois, and (b) $200,000 for a supposedly fictitious obligation to install sewers on the property.

This would mean that defendant had underreported his long-term capital gains by $122,523.76, had understated his taxable income by $58,136.88 and had underpaid his 1963 income taxes by $45,085.59 (Govt. Ex. 17).[3] After a bench trial, defendant was found guilty on both counts, given eighteen-month concurrent sentences and fined $5,000. We affirm.

### I. *Sufficiency of the Evidence*

In 1962, defendant purchased 23.6 acres of useable land in Schiller Park, Illinois, from Sam Papanek (and apparently from his brother, John Papanek) for $310,878.03. For purposes of this appeal the Government accepts defendant's figure of $39,231.22 for expenses, resulting in a correct basis for the property of $350,109.25. Defendant now admits that an additional $95,048.84 owed to Berry on a separate transaction "was mistakenly applied" by defendant in computing the cost of this property. This sum was owed to Berry for work done at defendant's Lawrencewood Shopping Center—a different piece of property and a completely unrelated transaction. The cost basis of the Schiller Park property was incorrectly increased in this amount as follows: Defendant's purchase of this property from Papanek

1. 26 U.S.C. § 7206 provides in pertinent part:
 "Any person who—
 "(1) *Declaration under penalties of perjury.*—Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter;
 \* \* \*
 shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution."

2. 26 U.S.C. § 7201 provides:
 "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty

of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution."

3. These figures are based on Govt.Ex. 17 which uses $33,031.22 as the amount of expenses Krilich incurred in purchasing the property to arrive at the cost basis of the property. As noted in the text, *infra,* the Government is willing to accept defendant's figure of $39,231.22 as the amount of acquisition expenses for purposes of this appeal. Of course, if the cost basis is increased by $6,200.00, that amount would have to be partially allocated to the two parcels of real estate sold in 1963, and the amounts of long-term capital gains, taxable income, and taxes owing as set forth in Govt.Ex. 17 would correspondingly change and alter the figures given in the text to which this note is attached.

was pursuant to an escrow agreement established at the Chicago Title & Trust Company on September 10, 1962.[4] Defendant was to receive the deed for the property upon deposits of $51,000 and $259,878.03, or a total of $310,878.03.[5] Defendant's first payment in the amount of $51,000 was by his check of September 13, 1962. The escrow agreement provided that the second payment of $259,878.03 could be "proceeds of a loan to be deposited under a separate money-lender's escrow." Defendant and Berry entered into such an escrow agreement on March 11, 1963, and defendant's title was recorded on March 27, 1963. The escrow agreement stated that defendant was about to acquire title to this property and provided that Berry would deposit $259,878.03 in escrow at the Chicago Title & Trust Company to be used to consummate the purchase. In turn, defendant was to issue his promissory note to Berry in the sum of $354,926.87. This amount consisted of the $259,878.03 payment due on the purchase of the land, plus an unrelated $95,048.84 owed Berry by defendant for the work Berry had done at the Lawrencewood Shopping Center.

The entries made in defendant's books failed to reflect that the aforesaid $354,926.87 consisted of a $259,878.03 loan and the old debt of $95,048.84. Thus there is an August 31, 1963, entry in defendant's books debiting the Lawrencewood Shopping Center account in the amount of $354,926.87 and crediting the note to Berry in the same amount per the March 1963 agreement.[6]

Thereafter, Herbert A. Maier, an accountant who took care of defendant's and the Lawrencewood Shopping Center's books, discovered that the $354,926.87 was not properly debited to the Shopping Center. Pursuant to defendant's instructions,[7] Maier made an adjusting entry removing the $354,926.87 from the Shopping Center account and entering it in defendant's land account. This adjustment likewise did not distinguish between the $259,878.03 second payment on the Schiller Park property and the unrelated $95,084.84. The total of these two sums was entered in the land ledger account, incorrectly increasing the cost basis of the property by $95,048.84.

 In our view, the district court could properly find the $95,048.84 mis-

---

4. Defendant claimed to be entitled to long-term capital gain treatment on the sale of two portions of this property on the theory that he made a contract to purchase the Schiller Park land from Steven O'Donnell on May 3, 1961, and that the holding period should run from that date. However, O'Donnell never owned the property and in May 1961 was merely anticipating securing title to it, an expectation which never materialized. The contract with O'Donnell never was consummated and Krilich signed an escrow agreement to purchase the property from Sam Papanek in September 1962, under whose terms title would not have passed until $259,878.03 was deposited in March 1963. While we are not concerned with whether Krilich committed an offense in using the May 1961 date (and while the propriety of long-term gain treatment is assumed in the calculations herein), it seems incredible that Krilich would reasonably, or even mistakenly, believe that May 3, 1961, was his acquisition date, especially in view of O'Donnell's dis-

claimer of ever having owned the property.

5. The purchase-escrow agreement provided for an additional payment of $140,021.97 on the contingency that a firm, apparently unrelated to the seller or purchaser, deposit certificates attesting to the installation of storm sewers complying with village ordinances and to the rezoning of the property. Defendant has shown no connection between this provision and the $200,000 increase in the cost basis of the north tract of Schiller Park property sold to Parrish in 1963 (see *infra*), nor does he argue that it supports it in any way. Nothing in the record indicates nor does the defendant contend that the contingency ever occurred.

6. The next entry in the journal reflects a repayment of the $259,878.03 to Berry from the proceeds of a sale of six acres of the property to Joseph D. Testa.

7. The adjustment was labeled in the books as "per RRK," referring to defendant.

application to the basis of the property to be willful. Unlike us, the district judge as the trier of facts had the benefit of personally judging the credibility of the witnesses tendered by both parties. The amount in question was buried as part of the Schiller Park cost basis, and its true origin was difficult to trace. Defendant was a sophisticated taxpayer, not a "babe in the woods."[8] According to accountant Maier, the entry erroneously including this amount in the cost of the Schiller Park property was made at defendant's direction and therefore marked "Per RRK." The agreement defendant entered into with Berry on March 11, 1963, clearly distinguished between the $259,878.03 which Berry was to deposit for the purchase of the Schiller Park property and other debts owed Berry by defendant. The repayment provisions of this agreement explicitly maintained the same difference, as did the treatment of the funds received from the sale of six acres to Testa (see note 6 *supra*). The addition of the $95,048.84 to the cost of the Schiller Park property gave defendant a present financial benefit in the taxable year 1963. Therefore, it is immaterial that he may have lost the opportunity of including it in the Lawrencewood books for depreciation over a period of years. As the trial judge stated in denying the first motion for acquittal, "I think the allocation as it was actually done gave the taxpayer a significant tax advantage over whether it had been properly allocated in the first place." Furthermore, from Maier's testimony, it would appear that the $95,048.84 had not actually been deleted from the cost of the Lawrencewood Shopping Center and was included in its depreciation for tax purposes. Finding willfulness in a tax case neces-

sarily often involves a subtle determination. Our conclusion is that the finding here as to the $95,048.84 item was sufficiently supported to warrant countenance.

In April 1963, defendant contracted to sell approximately six acres of the Schiller Park property south of Lawrence Avenue (except the east 250 feet thereof) to Joseph D. Testa for $283,500. Title was conveyed by defendant's land trustee in June 1963. The documents effectuating this transaction do not refer to any obligation of defendant to install sewers of any kind on this tract, although defendant did tell Testa that he had engineering plans relating to the installation of storm sewers along Lawrence Avenue. Subsequently Testa installed his own sewers and water mains and rerouted a diagonal ditch on his property. However, he never agreed that defendant should install sewers on the property, nor did defendant reimburse Testa for his sewer construction. In reporting his gain on the sale of the land to Testa, defendant did not include any amount for storm sewers in computing his basis.

On August 23, 1963, defendant's land trustee of the remainder of the Schiller Park tract contracted to sell approximately eight acres of the property north of Lawrence Avenue (except the east 445 feet thereof) to John Parrish Enterprises, Inc. ("Parrish") for $542,000. The contract made no reference to any obligation of defendant or the trustee to install sewers. A second contract between Parrish and Krilich Builders, Inc. (whose president was defendant) provided that Parrish pay $58,000 for the installation of small sewers and water connections on the property Parrish

---

8. Defendant's knowledge of federal income tax law was evidenced, for instance, by Parrish's sole stockholder's testimony that when he was negotiating with defendant for the purchase of eight acres of the property (see *infra*), the defendant insisted that two contracts be entered into—one for the sale of the land with defendant as the seller and one for the installation of certain underground water and sewer improvements with Krilich Builders, Inc. as the contractor—instead of combining both transactions in a single contract, so that defendant could avoid being treated as a developer for tax purposes and thereby be able to qualify for capital gains treatment on the sale of the land.

purchased.[9] These improvements were not those for which defendant claimed he was obligated in the amount of $200,000. Defendant wanted the total purchase price of $600,000 divided into two portions ($542,000 for the sale of land and $58,000 for the installation of sewer and water lines), so that he could obtain capital gains treatment instead of being treated as a developer for tax purposes.[10] Parrish and its sole stockholder, John E. Perisich, had no other contract with defendant or Krilich Builders regarding the Schiller Park property purchased by Parrish.

Defendant's brother-in-law, Allen Sorenson, the Secretary of Krilich Builders, testified that early in 1962 he and defendant had discussed the possibility of enclosing the ditch along the south side of Lawrence Avenue and cutting diagonally across the property eventually sold to Testa. Accordingly, an engineer was hired to prepare drawings concerning the enclosing of the ditch with large pipe at a cost of $165,000 to $200,000. The plans also covered the installation of a storm sewer crossing under Lawrence Avenue. All these plans related to the south side of Lawrence Avenue and involved only storm sewers.

In early June 1964, defendant delivered his books and records to accountant Leon Solomon for the preparation of defendant's 1963 income tax return. Solomon prepared a return, which was never filed, allocating $146,207.15 as defendant's cost of the land sold to Parrish. Solomon testified that when he prepared the return, the last entry on defendant's ledger increasing his cost of the Parrish property by $200,000 was not on the records because Solomon's tick mark was not opposite the $200,000 entry. Solomon used tick marks to identify the entries in the books he used in preparing defendant's return because defendant

had complained that Solomon had not reported all 1960 interest deductions the book entries entitled him to in preparing defendant's 1960 tax return, and with tick marks Solomon could identify entries made *ex post facto*. Soon after defendant received a copy of the return prepared by Solomon, defendant told accountant Maier that the basis of the Parrish property should be higher because of a sewer contract connected therewith and presented by defendant to Maier. Defendant had not previously given this information to Solomon when he prepared the original return. In consequence of this advice, Maier made entries in defendant's books increasing the cost basis of the Parrish property by $200,000. Defendant had Maier rather than Solomon prepare an altered 1963 income tax return reflecting this increase in the cost. This was the return actually filed by defendant.

Defendant's principal argument to support the validity of the $200,000 Parrish property cost increase is his purported contractual obligation to pay Krilich Builders, Inc. $200,000 for sewer work. This argument is based on a very brief contract, bearing a date of September 25, 1963, between defendant and Krilich Builders, whereby he agreed to pay Krilich Builders $200,000

> "to install all underground improvements to the property in Schiller Park, Illinois, as per the Plat of Subdivision attached hereto and marked as Exhibit A; to include all necessary storm, sanitary and water mains, and including the crossing under Lawrence Avenue and tying into the main storm creek for services necessary to comply with the Village of Schiller Park."

Exhibit A was missing from the copy of the agreement inspected by the Government and has not been produced by defendant.[11] Nothing in the contract

---

9. The $58,000 was not reported in defendant's personal tax return as part of the sale price because Krilich Builders, Inc., and not Krilich in his individual capacity, was the contracting party.

10. See note 8 *supra*.

11. Defendant's brief takes the position that the contract covered the entire tract purchased by Krilich. If so, $200,000 could

ties the installation to any obligation respecting the already sold Parrish tract. It was never signed by the land trustee, the holder of the legal title to the property, but only by defendant, and on September 29, 1965, during the investigation of his 1963 tax return, defendant advised his accountant Maier that said contract "is void in toto."

The foregoing résumé shows that defendant did not obligate himself to Testa or Parrish to supply any storm sewers. Defendant never made such installations. The purported contract of September 25, 1963, between defendant and Krilich Builders, Inc. does not refer to the storm sewer (an enclosed ditch) south of Lawrence Avenue and single crossing discussed by defendant and the Secretary of Krilich Builders in 1962. It cannot reasonably be interpreted as the consummation of these discussions. Rather, the contract evidently related to totally different improvements on the Parrish tract, for the above-quoted description in the contract so suggests. Moreover, accountant Maier testified that, to the best of his recollection, when defendant presented him with the contract and conversed with him, the contract related either to the Testa or Parrish parcel, and defendant said one of the two properties was worth more because of the sewer, and Maier actually increased the cost of the Parrish parcel by $200,000. If the contract had actually referred to improvements south of Lawrence Avenue, the $200,000 obliga-

tion should not have been assigned to Parrish's north parcel, and, more importantly, the installation would still have been a "gift" to Testa in any event. Testa installed his own sewers on the south parcel he bought. The trier of fact could properly infer that the contract was spurious because defendant had already sold the south property to Testa and had already contracted to sell the north property to Parrish without in either case assuming any obligation to install sewers. The court was certainly justified in concluding that the contract dated September 25, 1963, was not *bona fide* and was hastily executed or spuriously discovered merely to convince accountant Maier in June 1964 that the cost basis of the Parrish property should be increased by $200,000. In this respect, it is surely significant that defendant did not exhibit the contract to accountant Solomon who had prepared the initial 1963 tax return showing the cost basis at only $146,207.15, but only tardily presented it to Maier after defendant saw his tax liability as computed in Solomon's return.

■ In sum, none of the witnesses or documentary evidence submitted by defendant supports the good faith or mere mistakenness of his belated $200,000 addition to the cost basis of the Parrish property. On the contrary, the evidence overwhelmingly supports the trial court's finding of willfulness, which we accordingly sustain as to the $200,000 overpadding.[12]

not be properly assigned to the cost basis of the tract sold to Parrish. Of course, such an improper allocation is not the gravamen of the Government's contention here, but the spuriousness of the contract is.

12. Defendant relies on Herzog Building Corp. v. Commissioner, 44 T.C. 694 (1965), apparently for the proposition that the erroneousness of the $200,000 addition to the basis of the Parrish tract is legally debatable and so concludes he could not possibly have entertained a criminal intent. Of course, nothing in *Herzog* suggests that a sham contract with a third party for sewer improvements

could possibly give rise to a legitimate issue with respect to the propriety of the $200,000 basis increase, and to intimate otherwise is ludicrous. Nothing in *Herzog* suggests either that though defendant was under no obligation whatever to install sewers on previously sold property, he could reasonably expect properly to increase the basis of that property by later entering into a sewer contract with a third party benefitting that property, even making the incredible assumption that he was doing that.

Defendant also relies on a passage in Jefferson Memorial Gardens, Inc. v. Commissioner of Internal Revenue, 390 F. 2d 161, 166 (5th Cir. 1968), stating "that

## II. *Suppression of Records*

Defendant asserts that his pretrial motions to suppress evidence should have been granted. The matters in question were:

1. 1964–1966 copies of records of defendant and work papers of Internal Revenue Service audit agent Leigh Brown, who had been assigned on December 8, 1964, to examine defendant's personal returns for 1960–1963. His audit closed on July 6, 1966.

2. Krilich's conversation with Special Agent Popovitz on November 17, 1969, in connection with his investigation of the income tax returns of Sam Papanek.

3. Krilich's conversations with Special Agent Popovitz on November 18, 1969, in connection with his income tax investigation of Papanek.

4. Defendant's records submitted by defendant's accountant Schelly to Revenue Agent Paul Seto on September 15, 1969, and on November 18, 1969, under an August 12, 1969, summons concerning the investigation of the income tax returns of Edward Bluthardt, Mayor of Schiller Park. These records related to defendant's Schiller Park property involved in the present indictment.

Defendant claims that these conversations and records were really secured for a criminal investigation of defendant, with the references to the Papanek and Bluthardt tax investigations as "a ruse and a facade" or a "pretense." Apparently the thrust of this claim is that incriminating evidence was obtained in violation of defendant's Fifth Amendment right.

■ Following the hearings on the motions to suppress, the district judge concluded that Revenue Agent Leigh Brown's investigation of defendant's civil tax liabilities had closed in 1966 and that these records and work papers were not in any way related to the 1969 criminal investigation of defendant. We fully agree with that conclusion. Special Agent Popovitz testified that the Brown work papers were attached to a memorandum concerning Sam Papanek and his brother John Papanek and were used by Popovitz before November 17, 1969, in investigating Sam Papanek's tax liabilities. It was suspected that in reporting a sales price of $237,000 from the sale of the Schiller Park property to Krilich, the Papaneks had not reported the full amount they had received since subsequent sales of the property from three to six months later brought over $800,000. Sam Papanek was then under a criminal tax fraud indictment concerning his transaction with defendant in 1963; his brother John was later indicted. As part of his investigation, Popovitz was required to determine the true price at which the Papaneks sold the Schiller Park property to Krilich in 1963. Popovitz inspected Brown's work papers for this purpose as a starting point in his investigation.

■■ The November 17, 1969, interview with defendant was in pursuance of the same investigation and was designed to ascertain the correct selling price received by the Papaneks from defendant, the exact date of sale, and the amount for which defendant sold part of the property in August 1963.[13] Since the defendant was given *Miranda* warnings at this interview, he cannot complain that the information he gave was extracted in violation of his Fifth

properly estimated costs of improvements to subdivided real estate is a capital expenditure allocable to the basis of the various unsold lots to be recovered by the developer upon his ultimate sale of the lots." We have no quarrel with that proposition, but even assuming, contrary to sup-

ported fact, that defendant acted in good faith, it does not describe what defendant did.

13. Special Agent Oshiro accompanied Popovitz to this interview solely to act as a witness.

Amendment right not to be compelled to incriminate himself. However, simply because *Miranda* warnings were given does not mean that defendant was a suspect toward whose ultimate conviction the Government's investigation was directed. In this case it appears the warnings were given out of an abundance of caution because of possible collateral criminal consequences to defendant in the investigation of the Papaneks. As the Government points out, if Popovitz was proved wrong in his hypothesis that the Papaneks underreported the selling price, it was possible that defendant had overstated his basis since he had reported a cost basis of over $600,000 for portions of the property purchased from the Papaneks. But the fact remains that the November 17th interview with defendant was in pursuance of Popovitz' investigation of the Papaneks. It was not until December 2, 1969, that Popovitz requested that a criminal investigation of defendant be opened and not until December 22nd of that year that the investigation was officially opened. Contacts with the defendant subsequent to one of these dates would have to be attended by *Miranda* warnings, but we need not decide between the two since the contacts giving rise to all the matters sought to be suppressed predated both these dates. See United States v. Dickerson, 413 F.2d 1111, 1112–1113, 1117 (7th Cir. 1969).

On November 18, 1969, Popovitz phoned defendant as a follow-up to his interview the preceding day, but since nothing tending to incriminate the defendant came out of this conversation, we need not be concerned with it in any event.

■ Also on November 18, Revenue Agent Seto obtained certain records from defendant's accountant Schelly. This request for records was pursuant to an August 12, 1969, Internal Revenue Service summons obtained for the purpose of investigating a third party, Edward Bluthardt, Mayor of Schiller Park,

and served on defendant's accountant by Special Agent Oshiro. The testimony at the hearing on the motion to suppress established that Seto and Oshiro were investigating the possibility of additional income taxes due from Mayor Bluthardt on unreported income gained for his assistance in obtaining the rezoning of defendant's Schiller Park property sold to Testa and Parrish. Defendant's records were summoned in an attempt to trace the suspected transfer of money. Revenue Agent Oshiro obtained records pursuant to the summons on September 15 as well as on November 18, 1969. Since the IRS employees' testimony at the hearing was not controverted, the district court was certainly entitled to conclude that the records obtained on these dates were acquired in connection with the investigation of the federal income tax liability of Mayor Bluthardt and not a camouflage to determine if defendant should be indicted. See United States v. Campione, 416 F.2d 486, 488–489 (7th Cir. 1969).

■ Defendant next argues that the November 17, 1969, conversation should be suppressed because the Special Agents in attendance did not advise defendant that they "had the function of investigating the possibility of criminal tax fraud" pursuant to Internal Revenue Service instructions of October 3, 1967 (reproduced in 420 F.2d at 811). However, this regulation requires that such a statement be given only to "persons suspected of criminal tax fraud." At the time of that interview, as shown by Special Agent Popovitz' unimpeached testimony, he was investigating only the possible criminal tax liabilities of the Papaneks. As aforesaid, Popovitz did not suggest a preliminary criminal investigation of defendant until December 2, 1969, and defendant's case was not assigned to a Special Agent until December 22, 1969, so that there was no violation of the Internal Revenue Service's regulations. See United States v. Campione, *supra*. In any event, defendant

was given the warnings prescribed by Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 at the outset of the November 17th interview.[14] Certainly this would alert him that he might then be suspected of violating federal criminal statutes. No more was required. Cf. United States v. Comiskey, 460 F.2d 1293, 1297 (7th Cir. 1972); United States v. Campione, *supra*.[15]

■■■■■ Defendant's third argument to support his motions for suppression is based on a supposed violation of the one-inspection rule contained in 26 U.S. C. § 7605(b), which provides:

"No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary."

Defendant argues the first inspection occurred on the occasion of agent Brown's audit closing in 1966 and that books and records of defendant examined between that date and November 18, 1969, were inspected in violation of the statutory rule. As shown, the criminal investigation by Popovitz did not commence before December 2, 1969. The books and records in question were obtained by the Internal Revenue Service on or prior to November 18, 1969, for use in their investigations of the Papanek brothers and Bluthardt. This statute does not apply to third-party investigations, but rather to the records of the taxpayer under investigation. Hubner v. Tucker, 245 F.2d 35, 38–39 (9th Cir. 1957); cf. United States v. Howard, 360 F.2d 373, 380 (3d Cir. 1966). The 1969 inspection of defendant's records was not concerned with the reexamination of his liability for a year already audited, so that the one-inspection rule is again inapplicable. See Norda Essential Oil & Chemical Co. v. United States, 230 F.2d 764 (2d Cir.), certiorari denied, 351 U.S. 964, 76 S.Ct. 1028, 100 L.Ed. 1484 (1956).[16] Additionally, the summons was served on defendant's accountant Schelly, and the bulk of the records in question were turned over by him to Revenue Agent Seto. Section 7605(b) has been held inapplicable to a taxpayer's records in the possession of his accountant. See Hinchcliff v. Clarke, 371 F.2d 697, 700 (6th Cir.), certiorari denied, 387 U.S. 941, 87 S.Ct. 2073, 18 L.Ed.2d 1327 (1967); Bouschor v. United States, 316 F.2d 451, 457 (8th Cir. 1963); cf. Geurkink v. United States, 354 F.2d 629 (7th Cir. 1965); DeMasters v. Arend, 313 F.2d 79, 86 (9th Cir. 1963). We conclude the statutory one-inspection rule was not violated.[17] We need not decide whether the single inspection rule in 26 U.S.C. § 7605(b) should be enforceable by the exclusion of evidence obtained in violation of it in a criminal case. Cf. Reineman v. United States, 301 F.2d 267 (7th Cir. 1962). However, it is noted that the

---

14. In contrast, in United States v. Heffner, 420 F.2d 809 (4th Cir. 1969), the full *Miranda* warnings were not given. *Id.* at 811, 813.

15. United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, 1419, 16 L.Ed.2d 510, does not support defendant for the Court stated "Blue would at most be entitled to suppress" evidence secured by the Government in violation of the Fifth Amendment. No violation of the Fifth Amendment occurred in the instant case.

16. On the other hand, 26 U.S.C. § 7605 does bar a reexamination in connection with a redetermination of a taxpayer's liability for a year already audited. Reineman v. United States, 301 F.2d 267 (7th Cir. 1962).

17. Because 26 U.S.C. § 7605(b) was not violated, it was unnecessary to comply with the notice requirements contained therein and in 26 C.F.R. 601.105.

proper means for enforcing this conditional statutory right is to challenge the summons at the time compliance is sought. United States v. Powell, 379 U. S. 48, 58, 85 S.Ct. 248, 13 L.Ed.2d 112.

## III. *Denial of Defendant's Request for Documentary Production*

 Under the Jencks Act, defendant sought to inspect the grand jury testimony of government witness Joseph Testa, who purchased six acres of the Schiller Park property from defendant. Pursuant to 18 U.S.C. § 3500(c), the district judge inspected Testa's grand jury statement and concluded that it did not "relate to the subject matter of the testimony of the witness," as prescribed by the statute. A similar determination was made with respect to the grand jury testimony of Special Agent Popovitz. As prescribed by the same statutory provision, we too have examined the texts of these witnesses' grand jury testimony and conclude that the rulings of the trial judge were correct.

Defendant also sought to inspect Special Agent Popovitz' "S.A.R." report, consisting of the summary of his investigation of defendant. However, such a report is not a "written or recorded statement * * * made by the defendant" within the meaning of Rule 16(a)(1) of the Federal Rules of Criminal Procedure under which production was sought. Defendant was given the memoranda of the Special Agent's interviews with defendant, so that he was not prejudiced by the denial ruling.

Finally, defendant claims that it was reversible error to deny production of Agent Leigh Brown's transmittal letter of May 23, 1966, dealing with defendant's civil tax liabilities and transmitting his report of the same date to an IRS superior. As shown by the record, a copy of the report itself was given to defendant's accountant. Since the transmittal letter is not a "written or recorded statement * * * made by the defendant," he was properly denied production under Rule 16(a)(1).[18]

Affirmed.

---

18. Neither Popovitz' summary of investigation nor Brown's transmittal letter was a "statement" as defined in 18 U.S.C. § 3500(e) and hence was not producible under the Jencks Act either. United States v. Keig, 334 F.2d 823, 825 (7th Cir. 1964).