**UNITED STATES of America and Henry Graner, Exempt Organizations Specialist of the Internal Revenue Service, Petitioners-Appellants,**

v.

**Dale K. DYKEMA, as Pastor of Christian Liberty Church, and Christian Liberty Corporation d/b/a Christian Liberty Academy and/or Church of Christian Liberty, Respondents-Appellees.**

No. 80–2750.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1981.

Decided Dec. 9, 1981.

Karl P. Fryzel, Dept. of Justice, Washington, D. C., for petitioners-appellants.

John W. Whitehead, Manassas, Va., for respondents-appellees.

---

\* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, sitting by designation.

1. The church is said to be Calvinist in doctrine, but unconnected with any presbytery, synod,

Before CUMMINGS, Chief Judge, and PELL, Circuit Judge, and DUMBAULD,\* Senior District Judge.

DUMBAULD, Senior District Judge.

Before us for review is an order of the District Court denying enforcement under 26 U.S.C. § 7604(a) of an Internal Revenue summons under 26 U.S.C. § 7602. The summons was directed to Dale Dykema, pastor of an autocephalous church known as the Christian Liberty Church,[1] located at 3675 N. Calhoun Road, Brookfield, Wisconsin, and called for fourteen comprehensive categories of records belonging to the church. The stated purpose of the request was to enable a determination to be made by the IRS whether the church was an exempt organization under 26 U.S.C. § 501(c)(3), and hence a proper recipient of deductible contributions under 26 U.S.C. § 170(c)(2), whether the church was liable for any tax on unrelated business income under 26 U.S.C. §§ 511–514; and whether Dykema individually was liable for any tax. (The individual liability of John H. Vouga, apparently an assistant pastor, is also under investigation.)

Insofar as the pastor's individual tax liability is concerned, the case is clear. His tax liability is to be investigated and established in the same manner as that of any other taxpayer. And in that connection records of other parties, including his employer, even though it be a church, may be examined if they are such as to throw light on his individual tax liability. *U. S. v. Grayson Co. Stage Bank*, 656 F.2d 1070, 1076 (C.A.5, 1981); *U. S. v. Krilich*, 470 F.2d 341, 350 (C.A.7, 1972). Such examination is subject only to the usual requirements "that the investigation [has] a legitimate purpose, that the inquiry may be relevant to the purpose, that [the IRS does not already have] the information sought, and

or general assembly. It is said to be composed of approximately only 15 members, though a throng of spectators occupied the back rows of the courtroom during argument of the case.

that the administrative steps required by the Code have been followed." *U. S. v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964).[2] These requirements have been met in the case at bar. Nor would such investigative authority of the IRS be diminished even if excessive and unreasonable payments from church funds to the pastor disclosed "inurement" to him, a circumstance which is of importance with respect to the exempt status of the church, as will shortly be seen.

The District Court in the case at bar departed from the *Powell* standard of relevance by imposing a stricter requirement that the information sought must be "truly necessary" to enable the IRS to perform its statutory functions. This view is apparently based on the language of 26 U.S.C. § 7605(c) that examination of the books of account of a church shall be made only "to the extent necessary" to determine the amount of tax on unrelated business income.

■ But this provision of the statute relates only to the topic of unrelated business income. It does not restrict the scope of examination with respect to other issues for determination by the IRS when investigating an allegedly exempt organization, *e.g.* whether the organization is in fact an exempt organization by reason of its being engaged in activities of the sort which Congress specified as proper for conferring exempt status, or whether part of the organization's net earnings inures to the benefit of any private shareholder or individual, or whether it engages in propaganda to influence legislation or participates in political

campaigning on behalf of any candidate for public office.

Indeed § 7605(b) itself expressly permits examination even of the *religious* activities of such an organization to the extent necessary to determine whether the organization is entitled to exempt status by reason of being a church.

■ Hence the District Court's application of a "truly necessary" standard is error. The *Powell* standard of relevance is appropriate to the inquiry as to the existence *vel non* of exempt status.

The exempt status of an organization depends on several factors, and is more complicated than the situation with regard to the individual tax liability of the pastor or other church employees.

In pertinent part, the tax exempt status defined in 26 U.S.C. § 501(c)(3) is granted to "Corporations ... organized and operated exclusively for religious ... purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation ... and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

[5, 6] Thus the subsidiary topics concerning which the IRS is entitled to inform itself[3] in investigating the tax exempt status of an organization include the following:

**2.** There is no occasion in the case at bar to examine the further complications that would arise if criminal prosecution were contemplated. See *U. S. v. White*, 309 F.Supp. 508, 509 (W.D.Pa.1970); *U. S. v. Morgan Guaranty Trust Co.*, 572 F.2d 36, 39–41 (C.A.2, 1978); *U. S. v. LaSalle Natl. Bank*, 437 U.S. 298, 316–18, 98 S.Ct. 2357, 2367–68, 57 L.Ed.2d 221 (1978). The evidence shows that the intelligence agents earlier involved in the affairs of these taxpayers have "bowed out" of the case and that now only collection of tax is under consideration.

**3.** It must be remembered that tax exemption is a privileged status and that the taxpayer claiming it has the burden of demonstrating entitlement thereto; and also that the IRS has a statutory duty *ex officio* "to canvass and to inquire" concerning all persons "who may be liable to pay any internal revenue tax." *Donaldson v. U. S.*, 400 U.S. 517, 523, 91 S.Ct. 534, 538, 27 L.Ed.2d 580 (1971); 26 U.S.C. § 7601. This inquisitorial function is akin to that of a grand jury, and no "probable cause" is necessary before a summons is issued to a particular taxpayer. *U. S. v. Powell*, 379 U.S. 48, 56, 85 S.Ct. 248, 254, 13 L.Ed.2d 112 (1964).

■ 1. Is the organization properly *organized*, with a corporate structure suitable for carrying out religious purposes?

■ In this connection the church's certificate of incorporation would be relevant and material. Apparently the IRS has already been furnished this document. Although perhaps issued at an earlier date than the tax years under investigation, the IRS should be able to determine without difficulty whether the charter had been revoked for any reason or was still in force during the pertinent period.

2. Is the organization *operated* exclusively for religious purposes?

■ In connection with this inquiry, it is necessary and proper for the IRS to survey all the activities of the organization, in order to determine whether what the organization in fact does is to carry out a religious mission or to engage in commercial business. Such a survey could be made by observation of the organization's activities or by the testimony of other persons having knowledge of such activities, as well as by examination of church bulletins, programs, or other publications, as well as by scrutiny of minutes, memoranda, or financial books and records relating to activities carried on by the organization.

■ Typical activities of an organization operated for religious purposes would include (a) corporate worship services, including due administration of sacraments and observance of liturgical rituals, as well as a preaching ministry and evangelical outreach to the unchurched and missionary activity *in partibus infidelium*; (b) pastoral counseling and comfort to members facing grief, illness, adversity, or spiritual problems; (c) performance by the clergy of customary church ceremonies affecting the lives of individuals, such as baptism, marriage, burial, and the like; (d) a system of nurture of the young and education in the doctrine and discipline of the church, as well as (in the case of mature and well developed churches) theological seminaries for the advanced study and the training of ministers.

■ Objective criteria for examination of an organization's activities thus enable the IRS to make the determination required by the statute without entering into any subjective inquiry with respect to religious truth which would be forbidden by the First Amendment. *U. S. v. Ballard*, 322 U.S. 78, 86–88, 64 S.Ct. 882, 886–87, 88 L.Ed. 1148 (1944).[4] Likewise there is no "establishment of religion" involved in determining that entitlement to tax exemption has been demonstrated *vel non*.[5] As well said by Chief Justice Burger in *Walz v. Tax Commission*, 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970): "There is no genuine nexus between tax exemption and establishment of religion." Indeed, it should be emphasized that no real questions regarding "religion" as referred to in the First Amendment[6] are involved in the case at bar at all; the word "religious" concerns us merely in its statutory meaning as a description of a type of organization which Congress chose to exempt from taxation, believing that such relief from the tax bur-

---

4. In *Ballard*, Justice Jackson exclaimed: "I would ... have done with this business of judicially examining other people's faiths." 322 U.S. at 95, 64 S.Ct. at 890.

5. Clearly also there is no continuing supervision or regulation of the religious mission of the organization such as was condemned in *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 501–502, 99 S.Ct. 1313, 1319–20, 59 L.Ed.2d 533 (1979).

6. For a good recent exposition of the significance of "religion" in the constitutional sense, see opinion of Judge Adams in *Africa v. Commonwealth of Pennsylvania et al.* (3rd Cir.

1981), 662 F.2d 1025 (Prisoner not entitled to diet of raw foods as a requirement of religion founded by himself.) The same court will doubtless soon be confronted with the question whether the First Amendment authorizes perpetration of bank robberies by members of a sect in order to raise money for the support of their religion. Seventeen members of the New World of Islam were recently convicted in Newark for such offenses. New York Times, November 6, 1981. See also *Heffron v. Int. Soc. for Krishna Consciousness*, 452 U.S. 640, 651, 101 S.Ct. 2559, 2566, 69 L.Ed.2d 298, 309 (1981).

den would be beneficial and desirable in the public interest.[7]

The term "religious purposes" is simply a term of art in tax law, just like "collapsible corporation" or "Section 306 stock."[8] In that connection it must be remembered that more than 20 other types of exempt organizations, besides those for religious purposes, are listed in 26 U.S.C. § 501(c). The IRS has the same monitoring function with respect to all these groups, namely to determine whether their actual activities conform to the requirements which Congress has established as entitling them to tax exempt status.[9]

Since Biblical times it has been recognized that taxation belongs among "the things which are Caesar's." As narrated by an ex-tax collector:

> Shew me the tribute money. And they brought unto him a penny.
>
> And he saith unto them, Whose is this image and superscription?
>
> They say unto him, Caesar's. Then saith he unto them, Render therefore unto Caesar the things which are Caesar's; and unto God the things that are God's. [Matthew 22:19–21. See also Mk. 12:15–17; Lk. 20:24–25.]

3. Does any part of the organization's net earnings inure to the benefit of any private shareholder or individual?

■ This is the third question which must be addressed by the IRS in determining exempt status under § 501(c)(3). As previously indicated, if the pastor, for example, received an unreasonable or excessive salary [10] out of the net earnings from the operation of the church, the organization is not entitled to exempt status.

In connection with this factor, the financial books and records of the church would be relevant and important items for scrutiny by the IRS.

4. Does a substantial part of the activities of the organization consist of attempting to influence legislation?

■ Here the correspondence and publications of the organization would constitute significant data. Scrutiny of the activities of the organization *in toto* would be necessary in order to appraise and measure whether the forbidden conduct amounted to a *"substantial"* part of the organization's total activities. The financial records might also be useful in ascertaining the existence *vel non* of any payments to legislators, and the like.

5. Does the organization participate in political campaigns on behalf of any candidate for public office?

Here the same type of data as in item 4 would be useful.

■ It should be noted that exemption is lost under this item 5 by participation in *any* political campaign on behalf of *any* candidate for public office. It need not form a *substantial* part of the organization's activities.

*Quaere* whether participation in a political campaign *against* a candidate for public office is forbidden or participation in a political campaign relating to neither legislation nor the election of public officials (if there exists any such type of political campaign)?

It will be noted that inquiry concerning the foregoing matters, relating to the issue whether the organization under scrutiny is

---

**7.** See *Walz, supra,* 397 U.S. at 673, 90 S.Ct. at 1413.

**8.** "Section 306 stock" is defined in 26 U.S.C. § 306(c).

**9.** For an illustration of the quagmire of litigation arising with respect to whether a social club lost its exempt status under 26 U.S.C. § 501(c)(7) by reason of excessive use of club facilities by non-members, see *Pittsburgh Press Club v. U. S.,* 388 F.Supp. 1269 (W.D.Pa.1975); 536 F.2d 572 (C.A.3, 1976); 426 F.Supp. 553 (W.D.Pa.1977); 579 F.2d 751 (C.A.3, 1978); 462 F.Supp. 322 (W.D.Pa.1978); 615 F.2d 600 (C.A.3, 1980).

**10.** The test of unreasonable compensation here would be similar to that for determining deductibility of salaries paid by a business corporation. *Founding Church of Scientology v. U. S.,* 412 F.2d 1197, 1200–1201 (Ct. Claims 1969) [pastor received 10% of church's gross income].

a church or not, is not restricted by 26 U.S.C. § 7605(c) in any respect. To that extent § 7605(c) expressly permits examination of the religious activities of the organization. If such examination were not permitted, it is difficult to see how any church could qualify as a tax-exempt organization "for religious purposes."

With respect to the third question under examination by the IRS in the case at bar (whether the church was liable for any tax on unrelated business income) further complications must be taken into account. In the first place, procedurally, the restrictions of 26 U.S.C. § 7605(c) *do* apply.[11] Secondly, and substantively, it must be determined what constitutes unrelated business income.

 With regard to the procedural question, a high-ranking IRS officer must *believe* that the organization may be engaged in carrying on an unrelated trade or business or otherwise taxable activity; and so notify the organization in advance of the examination. Moreover, the examination of corporate books of account must be limited to that which is necessary to determine the amount of tax imposed.[12]

The concept of tax on unrelated business income of an exempt organization became part of the Internal Revenue Code in 1950. With respect to churches it became effective for tax years beginning after December 31, 1969.[13] The 1950 legislation was inspired by a desire to eliminate unfair competition between ordinary commercial companies and similar companies owned by a tax-exempt organization. Before 1950 a "feeder" company all of whose income was destined for a tax-exempt holding company, even though the source of its income was from a commercial trade or business, was itself treated as a tax-exempt organization. The best-known example of this abuse was the macaroni company operated for the benefit of the New York University law school.[14]

The post-1950 system was also more satisfactory than the old in that it permitted a tax-exempt organization to engage in an unrelated profit-making trade or business without risking the complete loss of tax-exempt status. Previously such status was jeopardized by engaging in substantial unrelated commercial operations.[15]

---

11. 26 U.S.C. § 7605 provides:
 No examination of the books of account of a church or convention or association of churches shall be made to determine whether such organization may be engaged in the carrying on of an unrelated trade or business or may be otherwise engaged in activities which may be subject to tax under part III of subchapter F of chapter 1 of this title (sec. 511 and following, relating to taxation of business income of exempt organizations) unless the Secretary (such officer being no lower than a principal internal revenue officer for an internal revenue region) believes that such organization may be so engaged and so notifies the organization in advance of the examination. No examination of the religious activities of such an organization shall be made except to the extent necessary to determine whether such organization is a church or a convention or association of churches, and no examination of the books of account of such an organization shall be made other than to the extent necessary to determine the amount of tax imposed by this title.

12. To determine the *amount* of tax liability, there would need to be a prior determination with respect to the *existence* of such a liability by reason of the corporation's carrying on an

unrelated trade or business. The books of account could therefore be used *in limine* to resolve that issue.

13. Section 301 of the Act of September 23, 1950, 64 Stat. 948 amended sections 421 and 422 of the 1939 Code. These provisions were carried over into sections 511–514 of the 1954 Code. The exclusion of churches from the application of the tax on unrelated business income was repealed when Section 121 of the Act of December 30, 1969, 83 Stat. 536, amended Section 511(a)(2)(A) of the 1954 Code by deleting the words "(other than a church, a convention or association of churches ...)."

14. *C. F. Mueller Co. v. C.I.R.*, 190 F.2d 120, 121 (C.A.3, 1951).

15. Thus an art museum would probably be permitted to sell photographic reproductions of masterpieces in its collection, for thereby its educational function of making such masterpieces available to the public would be furthered. Likewise an agricultural college might operate a wheat farm. Similarly a church could probably sell Bibles. But not operate a winery or distillery. *De LaSalle Institute v. U. S.*, 195 F.Supp. 891, 901 (N.D.Calif.1961). See also note 9 *supra*.

The term "unrelated trade or business" is defined by 26 U.S.C. § 513(a) as "any trade or business the conduct of which is not substantially related . . . to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501." It was expressly provided that notwithstanding its engaging in taxable unrelated business the organization did not lose its tax-exempt status with regard to the activities which qualified it as a tax-exempt organization. 26 U.S.C. § 501(b).

■ Although the law contains detailed lengthy provisions relating to particular types of organizations, the foregoing account of the pertinent provisions relating to a church indicates with sufficient accuracy the extent of the monitoring function of the IRS in inquiring into the unrelated business income of a church. Any evidence tending to show that the church did or did not engage in an unrelated trade or business would be pertinent to an investigation of this topic and would support a summons (subject, as noted above, to the restrictions contained in 26 U.S.C. § 7605(c)).

Having reviewed the nature and extent of the matters to be inquired into by the IRS in connection with determination of potential tax liabilities arising in connection with the activities of tax-exempt organizations, we shall now turn our attention to the question whether (and to what extent) the material subpoenaed by the IRS summons directed to Dykema and his Christian Liberty Corporation is relevant and material to the inquiries which it is the statutory duty of the IRS to pursue.

■ Item 1 of the summons calls for records of receipts and disbursements during the tax years under investigation (1975–1978). In particular it seeks records of contributions to the organization and of sales of merchandise, and payroll records. It seems clear that this information would be relevant to determining whether the organization was a church supported by members or a commercial organization whose income was derived from sales of merchandise. Payroll records would also show whether the employees were a normal church staff or a commercial sales organization.

Item 2 calls for balance sheets for the period in question. This is a normal type of financial record and would undoubtedly be useful to the investigation.

Item 3 requests documents related to the church's organizational structure and is essential to the question of organization, as previously discussed.

Item 4 calls for correspondence files. As previously indicated, this would be relevant to determination whether normal church-type activities were being conducted, or commercial operations, or attempts to influence legislation or elect political candidates.

Item 5 asks for names of officers, directors, trustees or ministers. This is obviously an appropriate request. Similarly, item 6, calling for minutes of meetings, is obviously a proper means of scrutinizing the official actions of the organization.

Item 7 calls for specimens of publications. The value of such literature for the investigation has previously been indicated.

Item 8 asks for names of persons ordained or otherwise given recognition by the organization. While it is unlikely that a small church such as involved here would be involved in such activities, it is easy to simply answer "none" if that is the case. The inquiry is appropriate as standard "boiler plate" material since a number of meretricious religious groups do operate "diploma mills" purporting to license "ministers" indiscriminately.

Similar considerations apply to item 9, inquiring as to subordinate affiliates.

Item 10 simply seeks documentary evidence of the performance of sacerdotal functions. This is obviously a proper inquiry, as is item 11 which seeks "documents reflecting the principles, creeds, precepts, doctrines, practices and disciplines" es-

poused by the organization. In like vein item 12 calls for documents reflecting conditions for church membership or ordination.

Item 13 inquires as to "vows of poverty." Here again it is unlikely that this inquiry affects this particular small church, but again it is easy to return a simple negative answer, if appropriate. The inquiry is proper for a standard IRS list since it is common knowledge that such vows have been known in Roman Catholic tradition for many centuries. A notable example is St. Francis of Assisi.

Item 14 seeks documentary evidence of assignment of income to the organization. This, like item 1, would be pertinent to the demonstration of religious as contrasted with commercial purposes, but would also relate to possible issues of "inurement" which have been previously discussed as a significant statutory factor in the determination which the IRS is charged with the duty of making.

In short, detailed examination of the fourteen items embraced in the summons discloses that all of them are appropriate inquiries relevant and necessary to the proper performance of tasks entrusted to the IRS by Congress. There is no good reason shown why the data sought should not be produced. The decision of the District Court must be reversed, with directions to enforce the summons in accordance with 26 U.S.C. § 7604(a).

*Reversed.*