**PITTSBURGH PRESS CLUB,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 73–1051.**

United States District Court,
W. D. Pennsylvania.

Feb. 13, 1975.

---

Leonard M. Mendelson, Hollinshead & Mendelson, Pittsburgh, Pa., for plaintiff.

Thomas R. Jones, Tax Div., Dept. of Justice, Washington, D. C., Richard L. Thornburgh, U. S. Atty., for defendant.

## OPINION

DUMBAULD, District Judge.

In this case the Court is invited by the Government to follow the footsteps of

"one who treads alone
Some banquet hall deserted,
Whose lights are fled,
Whose garlands dead,
And all but he departed." [1]

We are to inquire what meals have been eaten and drinks drunk, and by whom, at the Pittsburgh Press Club in order to determine whether the club is entitled to maintain its status as a tax-exempt organization under 26 U.S.C. 501 (c)(7) as a club "organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder."

Concluding that the Press Club was not exempt, the Government on February 2, 1972, revoked plaintiff's tax-exempt status retroactively to June 1, 1966, and assessed and collected deficiencies amounting to $228,483.00. Plaintiff paid that sum, and sues for refund. Defendant has filed a counterclaim seeking $55,988.18 in interest. Fiscal years ending May 31, 1967 through 1971 are involved. These years are open, appropriate waivers having been signed. Exemption had been recognized on October 17, 1959. Trial was held November 25–27, 1974, followed by oral argument and comprehensive briefs.

1. Thomas Moore. See also Dido's similar expedition. Vergil, *Aeneid*, Bk. IV, ll. 81–82.

In support of its position the Government relies on various interpretative publications issued by the Internal Revenue. Plaintiff contests the legal validity of these amplifications of the statute. The Court warmly endorses the familiar language of the illustrious Learned Hand:

> In my own case the words of such an act as the Income Tax, for example, merely dance before my eyes in a meaningless procession: cross-reference to cross-reference, exception upon exception—couched in abstract terms that offer no handle to seize hold of —leave in my mind only a confused sense of some vitally important, but successfully concealed, purport, which it is my duty to extract, but which is within my power, if at all, only after the most inordinate expenditure of time. I know that these monsters are the result of fabulous industry and ingenuity, plugging up this hole and casting out that net, against all possible evasion; yet at times I cannot help recalling a saying of William James about certain passages of Hegel: that they were no doubt written with a passion of rationality; but that one cannot help wondering whether to the reader they have any significance save that the words are strung together with syntactical correctness. Much of the law is now as difficult to fathom, and more and more of it is likely to be so; for there is little doubt that we are entering a period of increasingly detailed regulation, and it will be the duty of judges to thread the path—for path there is —through these fantastic labyrinths.[2]

These reflections apply *a fortiori* to Regulations, Procedures, Rulings, and other Treasury glosses on the tax statute itself. Regarding these emanations we echo the wish of the late esteemed Judge Goodrich in Keystone Automobile Club v. Comm'r., 181 F.2d 402, 406 (C.

A. 3, 1950): "The order of rank among administrative agencies making tax rulings is one we should like to avoid assigning if we can."

Succinctly stated, the Government relies on two contentions to justify revocation of the Club's exemption. The first contention is that the dues structure results in "net earnings" inuring to the benefit of regular members, who are the only voting members, but pay lower dues than other categories of members.

The second contention is that the volume of meals and drinks consumed by non-members on the club premises is so great that the club is engaged in a lucrative restaurant business, open to the general public, and thus is no longer being "operated exclusively for . . . nonprofitable purposes."

■ The record shows that the club was organized on March 18, 1885, as a Pennsylvania non-profit corporation. After various vicissitudes, it was reactivated about 1955. It was located in the old Sherwin hotel, then in 1961 purchased the former Kramer restaurant property and then in July, 1966, obtained a long lease on its present attractive headquarters in a penthouse at 300 Sixth Avenue (atop a building formerly McCreery's store).

An active member is "One who is regularly and directly concerned with gathering or preparing editorial material, and who is employed by a . . . newspaper published in Allegheny County, a press wire service or magazine of general circulation that maintains a full-time office in Allegheny County, or a radio or television station located in Allegheny County; or one who resides in Allegheny County and derives his principal source of income from creative writing produced directly for the general public."[3]

"News associate" members are, for the most part, persons connected with

2. Irving Dilliard (ed.), The Spirit of Liberty: Papers and Addresses of Learned Hand (2nd ed. 1953) 213, reprinted from 57 Yale L.J. (December, 1947), 167, 169.

3. PX–1, printed Constitution and By-laws, as amended June 15, 1967. A revision made in November, 1974, was described in the testimony of John H. Weisgerber.

media, but not in positions involving editorial judgment.

"Associate" members, for the most part, are persons engaged in advertising and public relations work, who have occasion for frequent contacts with the active press.

"Affiliate" members are persons regarded as important sources of news, or otherwise deemed to have "a community of interest with the other categories of membership." [4]

The dues structure provides equality between active and "news associate" members. Dues of "associate" members are twice as high. Dues of "affiliate" members are one and a half times those of "associate" members.

Only active members may vote or serve as officers or directors of the club (except that the Treasurer may be from any category of membership).[5]

The distribution of members, as shown by a news letter issued in May, 1970, was 275 active; 123 news associate, 618 associates, and 736 affiliates.[6]

A witness engaged in conducting a radio news program[7] testified that he found it professionally useful to have contact at the club not only with fellow journalists but with the associate and affiliate members. The affiliate members from other professions furnish a reliable and convenient source of background information. As an example, the witness had helpful discussions with medical doctors at the club in connection with controversies in the news on the subject of abortion.

We do not find the Government's argument against the differential dues structure convincing or persuasive. The arrangement seems natural and appropriate. A similar system of classification is said to prevail among other press clubs throughout the nation.[8]

The dues structure simply reflects, in a rough way, ability to pay. While Walter Cronkite has admitted on the air that he receives a salary in six figures, many journalists are less affluent, and their dues may justifiably be less than those paid by a public relations man for Alcoa or a steel company. Affiliate members who are doctors, lawyers, stock brokers, and the like apparently find club membership attractive and not burdensome. At least no complaints have been registered. Plaintiff operates as a normal social club centered about a particular profession. The basic nucleus being persons connected with news media, it is natural that sources of news be admitted to membership, for the mutual benefit of all parties concerned.

It can no more be said that "earnings" inure to the members in the low-dues categories than that a college student living at home has "earnings" because he gets free meals in the parental household. It is merely an advantageous relationship which diminishes out of pocket expenses.

The argument that members whose dues are less than they otherwise might be are being "subsidized" by "earnings" is similar to the contention that exemption of church property from tax is a governmental subsidy amounting to establishment of religion. This reasoning was rejected by the Supreme Court in Walz v. Tax Comm., 397 U.S. 664, 675, 90 S.Ct. 1409, 1415, 25 L.Ed.2d 697 (1970), where Chief Justice Burger explained that in such a situation "the government does not transfer part of its revenue to churches but simply abstains

---

4. Honorary membership has been abolished, according to Mr. Weisgerber's testimony. A "Director's" member is an unusual type conferred by unanimous vote of the board of directors, as in the case of the pastor of a church located near the club which could have but did not object to the club's being granted a liquor license. Dues for such members are discretionary.

5. PX–1, Art. VI, sec. 1; Art. X, sec. 6. Dues may be changed by the Board of Directors but not more than 25% up or down in any one year. Art. V, sec. 9.

6. GX–5

7. William J. Steinbach, of station KDKA.

8. See PX–2.

from demanding that the church support the state."

In the dues structure of the Press Club it is equally true that the members with lower dues receive no income or earnings, but that the members willing to pay higher dues are simply abstaining from demanding that the members with lower dues support the club activities to a greater extent than they now do under the present arrangements.

The Government's second contention deserves more attentive consideration. Do so many non-members use the club's restaurant facilities that the club can no longer be regarded as "operated exclusively for . . . nonprofitable purposes"?

The precise number of meals and beverages consumed by non-members is uncertain, but is undoubtedly substantial. The club insists, however, that it does not serve the general public; that no non-member is permitted to use club facilities except as part of a group sponsored by a member. Apparently the sponsoring member would be liable to the club if the guests failed to make full reimbursement for the services furnished.

Many of the large events where many visitors are entertained (such as wedding or bar mitzvah receptions) are conceded by the Government to be genuine guest relationships.

The contest rages over occasions where a club member sponsors a meeting on club premises of an organization with which he is connected but to which non-members of the Press Club belong.

■ Of course it is clear that solicitation of the general public to ultilize club facilities would disqualify for the exemption. Keystone Automobile Club v. Comm'r., 181 F.2d 402, 404 (C.A. 3, 1950). Plaintiff, however, did not engage in such conduct. The general public was excluded, except when non-members attended an event sponsored by a member.

■ As the late distinguished Judge Goodrich plainly demonstrated in his opinion in the *Keystone* case,[9] merely being a non-profit corporation under State law is not enough to qualify for exemption. The organization must qualify as a social club in the usual sense of ordinary speech. *Ibid.*, 181 F.2d, p. 405. Plaintiff does fall within that category. It is a genuine normal social club, not a night-club entertainment spot or a "botthe club" (a facade for evading the hours restrictions in liquor laws) or similar essentially commercial operations.[10]

■ But solicitation of the general public is not required in order to forfeit an exemption. Merely permitting the general public access to club facilities and receiving "profits realized by the club from outsiders" suffices, when the volume of such profits is substantial, amounting to "more than half of the gross income derived from the dues and ordinary activities of the club" and is only indirectly incident to such normal activities. This is lucidly set forth by the estimable Augustus N. Hand[11] in

9. In that opinion Judge Goodrich makes the following amusing comment (pp. 404–405):
  We have been treated to a good sized dose of so-called canons of construction known as *noscitur a sociis* and *ejusdum generis* in connection with the argument. We find them just about as helpful in settling a specific case as those vials of distilled wisdom of the ages containing the phrases "birds of a feather flock together" and "a man is known by the company he keeps." Throwing a vague phrase into law Latin does not make it any more useful in construing a statute.

10. Such "clubs" evince a similarity to the old-time proprietary medical schools, and academies which were conducted for profit, even though they furnished an education of sorts for the money collected from students. Business training and trade schools of that sort still exist today, in order to absorb G.I. financial benefits. Rev.Ruling 58–588 relates to "clubs" of that type. 1958–2 Cumulative Bulletin 265.

11. We are, as always, mindful of the admonition of Justice Robert H. Jackson to "Quote B, but follow Gus." Kathryn Griffith, Judge Learned Hand and the Role of the Federal Judiciary (1973) 6.

his opinion for the court in West Side Tennis Club v. Comm'r., 111 F.2d 6, 8 (C.C.A. 2, 1940).

■ The requirement that revenue received from non-members, in order to maintain exemption, must be "incidental to club activities" is further clarified by Judge Wisdom's explanation that such revenue comprises that which is derived from "the services a club usually provides its members and their guests." U. S. v. Ft. Worth Club, 345 F.2d 52, 57 (C.A. 5, 1965).[12]

It is difficult to believe that the services furnished on the Press Club premises were not of the sort which "a club ordinarily provides" for its members and their guests.

It is clear that the services utilized by outsiders were precisely of the normal and usual sort provided by the club (or by any usual social club) for members and guests.

■ The Government's objection boils down to the fact that the charge for such services was ultimately paid and borne by non-members of the club. The Government contends that if the charge for club services is reimbursed to a member by the non-members benefitting from the services, or is reimbursed to the member by the member's employer, then the transaction is "outside business" and (if sufficient in volume) is destructive of the club's exemption.

These contentions are untenable. For at least almost a half century the Court takes judicial notice, corroborated by personal knowledge, that it is customary in the ordinary bona-fide guest relationship for non-members who are introduced as guests at a social club by a member to pay and bear charges incurred by the guest and charged to his guest card.[13]

Similarly, it is common practice for a corporate executive to maintain membership in a social club, where customers and other business associates are entertained in connection with the corporation's business, and for the member's employer to bear the cost of club dues and services furnished.[14] If Alcoa for example, pays the dues of its public relations director in the Press Club, such practice seems fully compatible with the normal and traditional functioning of social clubs, and fully compatible with the exempt status of such a club.

The Government also argues that exemption is forfeited where facilities are used by non-member groups whose membership does not comprise 75 percent or more of Press Club members. This test is derived from Revenue Procedure 64–36. (This source also specifies as a

12. The further requirement that outside profits must be "either negligible or non-recurring" seems to have been formulated as a basis for distinguishing two earlier Fifth Circuit cases. The Fort Worth Club's income was derived, through a subsidiary corporation, from renting out the bottom half of the club building. As Judge Estes, dissenting, points out, the huge amount of rent (based on a fortuitous and fortunate investment) is the only circumstance distinguishing the case from the earlier precedents. (345 F.2d at 58). The case is also weakened by the fact that the majority does not adequately meet the point that *rental* income (whatever its amount) was specifically excluded by 26 U.S.C. § 502 from the definition of trade or business carried on by "feeder" organizations. The 1969 amendment to 26 U.S.C. § 511(a)(2)(A) makes all exempt organizations subject to tax, and seems to undermine the majority's inference from the legislative history of the 1954 provisions. 345 F.2d at 56.

13. When in 1929 the writer of this opinion was in Philadelphia taking the cram course for the Pennsylvania bar examination, he stayed at the now defunct Penn Athletic Club through the courtesy of a college friend who was a member of the club, but his sponsor did not pay for the accommodations and services furnished to the guest. This is an ordinary common practice in bona fide guest relationships. With nostalgic sadness we note that the club was a victim of the depression. Comm'r. v. Penn Athletic Club, 176 F.2d 939 (C.A.3, 1949).

14. Even after the entertainment provisions were tightened up in 1962, 26 U.S.C. 274(a) expressly makes deductible "dues or fees to any social, athletic, or sporting club" if the taxpayer establishes "that the facility was used primarily for the furtherance of the taxpayer's trade or business and that the item was directly related to the active conduct of such trade or business".

guideline for audits a *de minimis* factor of $2,500 outside revenue, or 5 percent of the club's gross revenue.) 1964—2 Cum.Bull. 962.

■■ We consider the 75 percent requirement unreasonable and not a binding interpretation of the statute. Regulations and Treasury Decisions (approved by the Secretary of the Treasury) apparently have a greater dignity than other rulings issued for the guidance of employees in audits and of taxpayers desirous of avoiding controversial transactions. Higgins v. Comm'r., 312 U.S. 212, 215, 61 S.Ct. 475, 85 L.Ed. 783 (1941). But even Regulations are invalid if contrary to the underlying statutory authority. U. S. v. Calamaro, 354 U. S. 351, 359, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957); Dixon v. U. S., 381 U.S. 68, 73–74, 85 S.Ct. 1301, 14 L.Ed.2d 223 (1965).

■ In our opinion revenue from member-sponsored occasions involving attendance of non-members should not be considered as outsider transactions with respect to their impact on exempt status if it would be reasonable and normal, in the ordinary course of the activities usually pursued by social clubs, to utilize club premises or services for such occasions.

This is not to say that there is no limit to the extent to which a club may properly engage in activities open to non-members when sponsored by a member. If, for example, a member were to sponsor an event open to all alumni of Harvard University one would be inclined to think that such action was equivalent to holding out accommodation to the general public.

On the other hand, it would seem to be within the bounds of reason and custom for an affluent Chicago alumnus of the Law School class of 1917 to entertain his classmates at an affair in recognition of the accomplishments of an illustrious member of the class (Joseph N. Welch) when the American Bar Association met in Chicago in 1954 in the wake of the Army-McCarthy hearings.

And, where it would be reasonable and normal for an affluent club member to sponsor a particular event, it should be equally permissible for a less affluent member to do so under an arrangement involving reimbursement or direct collection from the invitee group. In other words, the event should be one in keeping with the nature of the club's normal activities and the relationship of the parties.

A mechanical test of 75 percent overlap in membership seems too arbitrary. The criteria should bear a closer connection to the factors of congeniality and compatibility with the club's normal activities.

Moreover, data submitted in evidence by plaintiff, particularly in the light of Mr. Weisgerber's testimony of November 27, 1974, point to the conclusion that the "outside business" of the Press Club was in fact considerably less than as calculated by the auditing agent.

Plaintiff contends (Brief, p. 10) that no court has denied exemption unless the percentage of outside income to total income was over 46%. Under the Government's figures (Brief, pp. 7, 15) the percentages in the case of the Press Club ranged from 11 to 17 percent for the year involved. According to a survey by plaintiff's accountant, the percentage was from 2 to 4 percent. (PX–12, 13, 19–21).

■ The Government's justification of retroactive rather than prospective revocation is based upon the contention that there was a knowing departure on the part of the club from representations made in a letter of June 3, 1964 (GX–4) that "We have discontinued allowing outside groups to use club facilities at any time."

However, from the testimony it appears that this assurance was given in connection with a program of "Luncheon with the Stars" of the Civic Light Opera which the club had been sponsoring but which was discontinued after the audit and admonition which led to the letter of 1964. It would therefore appear that there was not a deliberate violation of the representations made, which would warrant retroactive revocation, but

rather a bona fide controversy with respect to the propriety of later club practices and the validity of certain IRS pronouncements such as the 75 percent rule.

In short, we conclude that the activities of the Press Club did not violate the terms of the statute or Regulations; and that the Revenue publications of lesser dignity which they may have contravened, while helpful as a rule of thumb or guideline for audits, are not controlling in a contested case, where the applicable law must be interpreted and applied in the light of the total fact situation as developed in the record.

For the foregoing reasons we conclude that plaintiff is entitled to recover the tax paid under protest for the tax years involved in the case at bar.

This opinion shall be deemed to constitute the Court's findings of fact and conclusions of law. The parties are directed to calculate the amount to be recovered by plaintiff and to submit a proposed judgment in accordance with this opinion.