**PITTSBURGH PRESS CLUB**

v.

**UNITED STATES of America, Appellant.**

No. 75–1757.

United States Court of Appeals,
Third Circuit.

Argued Feb. 6, 1976.

Decided May 26, 1976.

Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Leonard J. Henzke, Jr. and Robert T. Duffy, Attys., Tax Div., Dept. of Justice, Washington, D.C., for appellant; Blair A. Griffith, U. S. Atty., Thomas A. Daley, Asst. U. S. Atty., Pittsburgh, Pa., of counsel.

Leonard M. Mendelson and Raymond J. Hoehler, Hollinshead & Mendelson, Pittsburgh, Pa., for appellee.

Before SEITZ, Chief Judge, and VAN DUSEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

PER CURIAM:

The principal issue presented by this suit for an income tax refund is whether the Pittsburgh Press Club (PPC) qualifies as an exempt organization under I.R.C. § 501(c)(7), 26 U.S.C. § 501(c)(7). That provision of the Tax Code exempts from federal income taxation

"Clubs organized and operated exclusively for pleasure, recreation, and other non-

profitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder."

The district court held that PPC was such an exempt organization, and granted judgment for the Club.[1] We reverse and remand this case for further proceedings.

The purpose of the Club is given in Article II of its Constitution and By-Laws (plaintiff's Exhibit 1, Civil No. 73-1051, W.D.Pa.):

"The purpose of the Club is to bring together in closer friendship members of the news and related professions, to provide and maintain clubrooms and facilities, to promote the interests of the professions and their members, and to afford members a means of assembling for discussion of common professional problems."

In 1959, the Internal Revenue Service determined that PPC was an exempt, § 501(c)(7) social club. As the result of an audit conducted in 1970 by Internal Revenue Agent Egisto Marcolini, the IRS on February 1, 1972, revoked the Club's exempt status effective as of the first day of the Club's fiscal year 1967 (June 1, 1966). The IRS assessed an income tax deficiency of $228,483.00 on PPC for its tax years 1967 to 1971. The Club paid the asserted deficiency and instituted the instant action seeking a refund of this amount plus interest.[2]

The Government contends that the revocation of the tax exempt status was proper for two reasons:

(1) One class of members pay substantially lower dues and initiation fees than other classes; that class receives benefits and services which they would not otherwise receive but for the greater dues and initiation fees paid by the other classes; and therefore net earnings of the Club inure to the benefit of some of its private shareholders.

1. *Pittsburgh Press Club v. United States,* 388 F.Supp. 1269 (W.D.Pa.1975).

2. The district court had jurisdiction under 28 U.S.C. § 1346. The United States counter-

claimed for $55,988.18 assessed as interest on the $228,483. but not yet paid.

(2) Substantial income for the Club is generated by permitting the Club's facilities to be used by members of the general public, i.e., persons or groups other than members of the Club and their bona fide guests; and therefore the Club is not "organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes . . . ."

### I. Membership Dues Scale

During the years at issue, the Club had four classes of members[3] and the dues structure was as follows:

| | |
|---|---|
| Actives | $30.00 |
| News Associates | $30.00 |
| Associates | $60.00 |
| Affiliates | $90.00 |

The Club contends that the prohibition of net earnings of a § 501(c)(7) social club inuring to the benefit of any private shareholder does not relate to the funds raised among members of the organization but only to funds generated from the public. However, *Rochester Liederkranz, Inc. v. United States,* 456 F.2d 152, 157 (2d Cir. 1972), relied on by PPC, makes it quite clear that § 501(c)(7) "prohibits inurement of internally generated 'net earnings' as well as profits from nonmember sources."

Nevertheless, we hold that the differential dues scale established by PPC does not, under the circumstances of this case, violate the inurement provision of § 501(c)(7). Our decision is based on the evidence, apparently credited by the district court, that the use made of the Club by each membership class is roughly proportional to the dues charged. See plaintiff's Exhibit 7. Moreover, any benefit inuring to an active member was limited to the difference between the $30.00 dues paid by him and the average amount of dues paid by the membership as a whole (approximately $53.70), and we consider such benefit to be *de minimis* under the circumstances of this case.[4]

### II. Income From Nonmembers

The 1970 IRS audit disclosed that during its fiscal years 1967–1969, PPC made special billings to over 1000 groups,[5] reflecting use of its facilities by the groups. Although every group was sponsored by a member,[6] Agent Marcolini concluded that approximately 80% of these group events were nonmember events because the persons participating did not involve a member to nonmember ratio of 3:1 or higher,[7] nor a bona fide member-guest relationship. The revenue generated by the groups found to

---

**3.** For a description of the various classes of memberships, see the district court opinion, 388 F.Supp. at 1272–73.

**4.** But see Rev.Ruling 70–48 (1970–1 Cum.Bull. 133).

**5.** The auditor excluded from his evaluations most groups of less than 20 persons or involving billings of less than $200. II App. at 278.

**6.** The sponsorship of a group by a member, by itself, if not sufficient to establish that the revenue from the event should be attributed to a member. The rationale for this is clearly set out in Rev.Proc. 64–36, § 3.03–04 (1964–2 Cum. Bull. 963).

**7.** If it is shown that 75% or more of the total number of persons in a group are also members of the club, the IRS considers all the revenue to have been member-generated. If the group contains a lower proportion of club members, "all of the receipts from the group will be considered as nonmember receipts unless the club can show from its records the amount of receipts from members of the club." Rev.Proc. 64–36, § 3.04 (1964–2 Cum.Bull. 963–64). See also Rev.Proc. 71–17, §§ 3.03, 4.03 (1971–1 Cum.Bull. 683–84). To the extent that this Revenue Procedure leaves the burden on the taxpayer to establish the portion of its revenues attributable to members, it is consistent with the accepted legal principle that a taxpayer has the burden of proving that he is entitled to an exclusion from tax. See authorities cited at page 8 below. On the other hand, Revenue Procedures must be considered in the light of the facts of each particular case and are only applicable where they "embody permissible administrative construction and application of the congressional mandate." See *John Provence # 1 Well v. C.I.R.,* 321 F.2d 840, 843 (3d Cir. 1963).

Agent Marcolini's conclusions apparently were based on conversations with the Club's manager, Mr. Duhon, over a "considerable time." II App. at 244–45.

be outside groups by the agent was over $280,000., ranging from 11% to 17% of gross receipts during the years involved. The amount of the profit derived from these groups is uncertain, but the Government's estimate is that the figure in 1968 was $26,000. and the figure in 1969 was $22,000. (brief for appellant at 41, relying on their computation of receivables from outside sources amounting to 11% to 17% of gross receipts).

PPC contends that 17% of gross receipts from nonmembers was not so substantial as to justify the revocation of § 501(c)(7) status, and that in any event the correct percentage figure was between 2 and 4%. Treasury Regulation § 1.501(c)(7)–1(b) provides:

"A club which engages in business, such as making its social and recreational facilities available to the general public . . . is not organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, and is not exempt under section 501(a) . . .."

If the amount of revenues generated by nonmembers alleged by the Government were not so substantial as to constitute "engaging in business," as this phrase is used in the above regulation, we would need to proceed no further. We hold, however, that the figures and percentages of gross revenues alleged by the Government are not, as a matter of law, below the threshold of "engaging in business." [8] See *Polish American Club, Inc. v. Commissioner,* 33 T.C.M. 925 (1974); *Minnequa University Club v. Commissioner,* 30 T.C.M. 1305 (1971); 6 Mertens, *Law of Federal Income Taxation,* § 34.22 (1975). On the other hand, the figures are also not so high that, as a matter of law, the § 501(c)(7) exemption is necessarily unavailable to PPC. The district court should make more specific findings on remand, including the percentage of gross receipts from nonmembers disclosed by the record.[8a] Other factors we think relevant are the amount of net profits derived from nonmembers,[9] the purpose for which a social club's facilities are made available to nonmember groups,[10] and the

**8.** We believe that the regulation is fully consistent with the statute.

**8a.** The boundary between legitimate outside income and "engaging in business" is not marked by any definite percentages. The I.R.S. recognized this in Rev.Proc. 71–16, where this wording, *inter alia,* was used:

"Even though gross receipts from the general public exceed [5% of total gross receipts], it does not necessarily establish that there is a nonexempt purpose. A conclusion that there is a nonexempt purpose will be based on all the facts and circumstances, including but not limited to the gross receipts factor."

We view the 5% figure, however, as the I.R.S. position on the appropriate level and not necessarily the one to be adopted by the district court in this case.

**9.** See *United States v. Fort Worth Club,* 5 Cir., 345 F.2d 52, 57, *modified,* 348 F.2d 891 (5th Cir.1965); *West Side Tennis Club v. Commissioner,* 111 F.2d 6, 8 (2d Cir.1940); *Jockey Club v. Helvering,* 76 F.2d 597, 598 (2d Cir.1935).

The Government contends that $10,000. in outside net income, which figure the Club quite possibly exceeded, is substantial and necessarily disqualifies any club from the benefits of § 501(c)(7). This contention is based on language in Senate Report No. 552, 91st Cong., 1st Sess. (1969–3 Cum.Bull. 423, 469–70), U.S.Code

Cong. & Admin.News 1969, p. 2027, dealing with an amendment of § 512, to extend the taxation of unrelated business income to § 501(c)(7) organizations. Using the same language as that relied on by the Government, it could be contended that the problem of outside income earned by exempt organizations was dealt with by Congress in 1969 by making that income, and only that income, taxable. Congress, therefore, must have contemplated that outside earnings of $10,000. would not necessarily strip a § 501(c)(7) organization of its general exemption. Furthermore, we note, particularly, the following language from the Conference Report No. 782, 91st Cong., 1st Sess. (1969–3 Cum.Bull. 644, 652), U.S.Code Cong. & Admin.News 1969, pp. 2392, 2405:

"The fact that an unrelated business income tax is payable by an organization is not intended to mean that the organization should, or should not, retain its exemption. This is to be determined on the basis of the organization's overall activities without regard to the fact that some of its activities are subject to the unrelated business income tax."

**10.** If the Club permitted its facilities to be used at or below cost by charitable organizations qualified under § 501(c)(3) for fund-raising events, we believe the gross revenue from such events should not be attributed to nonmember revenues.

frequency of use of club facilities made by nonmembers. On remand, the district court should make more specific findings on all relevant factors, including findings on the amount of "outside business" of the taxpayer revealed in the record as mentioned, *infra,* this page.

The Club's contention that receipts from nonmembers accounted for between 2 and 4% of gross receipts is based on the results of a survey sent to 25 members who sponsored group events at the Club. Twenty persons responded, of whom 12 indicated by their responses that the affairs they sponsored should not have been counted by the IRS as having produced revenue attributable to nonmembers. See plaintiff's Exhibit 13. At least two of the functions sponsored by those 12, however, had not been counted by the IRS agent as producing nonmember revenue. II App. at 256–57. The 10 remaining functions found by the survey to have been improperly (apparently) called nonmember functions accounted for almost 71% of the revenue produced by the sample. If the survey was otherwise a valid and probative statistical sampling, it would indicate that nonmember revenues were far lower than the 11–17% of gross revenue figure claimed by the Government.[11]

The district court concluded that nonmember revenue "was in fact considerably less than as calculated" by the IRS,[12] but the court made no finding of how much less. It should be noted that tax exemptions are to be strictly construed, see *United States v. Fort Worth Club,* 5 Cir., 345 F.2d 52, 55, *modified by* 348 F.2d 891 (5th Cir. 1965); 6 Mertens, *Law of Federal Income Taxation,* § 34.02 (1975), and that PPC had

an obligation to maintain records adequate to establish a right to the tax exemption it claimed, see I.R.C. § 6001.[13] In light of these considerations, the Club has the burden of establishing how much of the revenues was attributable to members or nonmembers.[14]

The judgment of the district court will be reversed, and the case will be remanded for further proceedings consistent with this opinion.

---

11. We express no opinion on the evidentiary value of the survey. That question is for the district court to resolve, at least in the first instance.

12. 388 F.Supp. at 1276.

13. See also *Polish Army Veterans v. Commissioner,* 236 F.2d 509, 512 (3d Cir. 1956). The current I.R.S. statement covering record-keeping is Rev.Proc. 71–17, § 4 (1971–1 Cum.Bull. 684) which superseded Rev.Proc. 64–36, § 4 (1964–2 Cum.Bull. 964).

14. At this juncture we have no occasion to pass on the retroactive effect of the IRS decision to take away PPC's tax exempt status. That matter should be determined by the district court if it decides that the tax exempt status of the Club should be revoked. We note that even though the taxpayer may not have made a knowing departure from representations made in the 1964 letter, this alone does not resolve the retroactivity issue.