**PITTSBURGH PRESS CLUB**

v.

**UNITED STATES of America, Appellant.**

**No. 79–1492.**

United States Court of Appeals, Third Circuit.

Argued Nov. 14, 1979.

Decided Feb. 20, 1980.

---

Robert J. Cindrich, U. S. Atty., Thomas A. Daley, Asst. U. S. Atty., Pittsburgh, Pa., M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Leonard J. Henzke, Jr., Robert T. Duffy (Argued), Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant.

Leonard M. Mendelson (Argued), T. Lawrence Palmer, Hollinshead & Mendelson, Pittsburgh, Pa., for appellee.

Before GIBBONS, HIGGINBOTHAM and SLOVITER, *Circuit Judges.*

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This case involves a suit for the refund of federal income taxes and the Government's counterclaim for uncollected interest. These claims result from the revocation of the Pittsburgh Press Club's tax exemption as a nonprofit social club under Section 501(c)(7) of the Internal Revenue Code of 1954 (the Code) because the Club's trade with nonmembers constituted an impermissible business for profit. The Government appeals for the third time from a judgment entered in the Club's favor. We hold that the district court's findings of fact are clearly erroneous and that the Club's trade with nonmembers was inconsistent with its exemption. However, we agree with the district court that the Commissioner abused his discretion in revoking the Club's exemption retroactive to 1967. We therefore will reverse.

I.

The Pittsburgh Press Club was first organized in 1885 under the laws of the Commonwealth of Pennsylvania as a nonprofit corporation. The Club was reactivated in 1955 after a period of dormancy. In 1956, it filed an application with the Internal Revenue Service (IRS) for exemption from income taxes as a social club. In 1959, the IRS determined that the Club was exempt from federal income taxes as a nonprofit social club under Section 501(c)(7) of the Code. The purpose of the Club as set forth in its exemption application is:

> To provide a professional and social meeting place for those engaged in news and advertising work on newspapers, magazines, radio and television and in public relations activities for the furtherance of common interests.

In 1964, Revenue Agent Ciro Aloisi examined the Club's books and records for fiscal year 1962, which encompassed June 1, 1961 through May 31, 1962. His report described the use of the Club by nonmembers as follows:

> On approximately 12 occasions during 1962 the Club permitted outside groups to have luncheons & parties on Club premises. Total income from these affairs was

about $1,000. The Club officers were informed during this exam that this practice jeopardizes their exempt status. A letter was received signed by Club officers, stating that this practice would be discontinued.

The letter stated:

Our organization has been examined by an agent of the Internal Revenue Service. We were informed that the use of club facilities, by outside groups, is jeopardizing our tax-exempt status.

We have discontinued allowing outside groups to use club facilities at any time.

The agent's report concluded that the Club was operating within the scope of its exemption.

The subsequent audit of the Club which triggered the revocation of its tax exemption occurred in 1970 when Revenue Agent Egisto Marcolini spent 200 hours auditing the Club for the fiscal years 1967, 1968 and 1969 (June 1, 1966—May 31, 1969). Marcolini's work papers included lists of approximately 1000 functions, arranged by date of use of the Club. With some exceptions, only those functions for which the charge exceeded $200 or which were for parties of more than twenty persons were listed. Marcolini prepared the work papers with the extensive cooperation of the Club's office manager and the Club's manager. As a result, Marcolini was able to determine which functions were permissible bona fide guest/host functions, and which were proscribed functions where members sponsored groups of outsiders. Member-sponsored functions are those arrangements in which a member sponsors use of the facilities by a group of nonmembers, who either pay the Club directly for use of the facilities or reimburse the sponsoring member for the Club's charge.

On the basis of the audit, Marcolini found that, of 388 functions in fiscal year 1969, only 62 or 63 were genuine guest/host functions. The remaining 325 functions consisted of outside groups of nonmembers sponsored by a member. For 1968, Marcolini's work papers listed 406 functions, of which 305 were classified as outside groups. For 1967, his work papers listed 223 functions, of which 170 were classified as outside groups. Thus, for the three fiscal years approximately 800 billings were attributable to outside groups. Marcolini also determined the amount of revenue from outside groups and the percentage of gross receipts attributable to outside groups in each fiscal year.[1]

In his audit report of June 16, 1970, Marcolini recommended that the Club's exempt status be revoked for fiscal year 1967 and for subsequent years. After the submission of protests by the Club, the Commissioner of Internal Revenue (Commissioner) revoked the Club's exemption as of June 1, 1966, the first day of the Club's 1967 fiscal year.

The Club disputed the determinations of the Commissioner and challenged his decision in court. The evidence offered by the Club consisted primarily of its own survey. This survey was based on 25 questionnaires that the Club sent to those members who reportedly had sponsored the 25 functions with the highest charges in fiscal year 1969. While twenty of those responses were returned, only nineteen can now be found. The Club's accountants projected from this survey to demonstrate that the Club's nonmember revenue was only two to four percent of its gross receipts.

Following a trial without a jury, the district court held that the Commissioner had

1. Those determinations are as follows:

| Year | Outside Revenue | Percentage of Gross Receipts |
|---|---|---|
| 1967 | $ 62,311 | 11.18 percent |
| 1968 | $101,472 | 16.31 percent |
| 1969 | $118,130 | 17.43 percent |

"Gross receipts" for this purpose do not include receipts from initiation fees. Rev.Proc. 64–36, 1964–2 Cum.Bull. 962, 964.

Neither Agent Marcolini's report nor the work papers of the Club's accountants supply data for June, July, August, September or October, 1966, which are the first five months of the Club's fiscal year 1967. There were no banquet-type facilities during this period. The club occupied new facilities in 1966 and banquet-type functions did not commence until November, 1966.

improperly revoked the Club's exemption. 388 F.Supp. 1269 (W.D.Pa.1975).[2]

The district court also rejected the Government's argument that the revocation should be effective beginning with 1967, the earliest of the three years audited. The court stated that the Club had not knowingly departed from its representations to the IRS that nonmembers were not permitted to use the Club and that revocation as of 1967 was not justifiable.

The Government appealed and this Court reversed and remanded. 536 F.2d 572 (3d Cir. 1976). While agreeing with the district court that the Club's dues structure did not violate Section 501(c)(7), we reversed, however, because of the lack of findings on whether the Club was engaging in business with the public. We held that the figures and percentages of gross revenues from nonmembers alleged by the Government were "not, as a matter of law, below the threshold of 'engaging in business.'" Id. at 575. Nor were they so high as necessarily to preclude exemption. We therefore remanded the case for more specific findings, including the volume of the Club's outside business, the net profits from nonmembers, the percentage of gross receipts from nonmembers, and the frequency and purpose of the use of the Club by nonmembers.

On remand the Club was granted leave to submit additional evidence. This evidence mainly consisted of a second survey, and related analysis, which covered all of the functions which the IRS had determined were nonmember functions. The additional evidence also included work papers, prepared by the Club's accountants, which listed all the functions held at the Club over the five years in issue, and set forth computations of the net profits or losses attributable to such functions.

On the basis of the new survey, the district court again held for the Club. 426 F.Supp. 553 (W.D.Pa.1977). It found that the Club's outside business constituted only two to four percent of the Club's revenue. The court also found that the Club's net profits from outside business were de minimis.

The Government appealed and this court again reversed and remanded. 579 F.2d 751 (3d Cir. 1978). We held that the second survey was inadmissible hearsay because it "was neither objective, scientific nor impartial." Id. at 759. We also instructed the district court that, for purposes of Section 501(c)(7), the Club's net profits from nonmember functions should be computed by reducing the Club's revenue from nonmembers only by the out-of-pocket costs of producing such revenue, and not by any share of the Club's fixed costs.[3]

On remand, no new evidence was introduced. The district court again ruled in favor of the Club. 462 F.Supp. 322 (W.D. Pa.1978). This appeal followed.

## II.

The Government argues first that the district court erred in ruling that the Club's tax exemption as a nonprofit social club under Section 501(c)(7) of the Internal Revenue Code of 1954 was improperly revoked.[4]

2. The court rejected the Government's arguments that the dues structure of the Club created a prohibited subsidy of the voting class of members and that the Club improperly was engaging in business with the public by permitting groups of nonmembers, sponsored by members to use the Club's facilities.

3. Again this court did not rule on the admissibility or weight of the first survey of the 25 members, although certain deficiencies in that survey were noted. 579 F.2d at 762 n.22. Similarly, this court did not rule on the question of whether the Club's exemption could properly be revoked as of 1967, although in the opinion's final footnote the pertinent facts and law were discussed. Id. at 763 n.24.

4. Section 501(c)(7) of the Internal Revenue Code of 1954, 26 U.S.C. § 501(c)(7), provides exemption from federal income tax for

Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder.

The Treasury Regulations on Income Tax provide that a club that "engages in business, such as making its social and recreational facilities available to the general public," is not exempt

The question of whether the Club's trade with nonmembers constituted an impermissible business for profit is a question of law. However, the district court's determinations of the volume, frequency, profitability and purposes of the Club's dealings with nonmembers are findings of fact. These findings can be rejected only if they are clearly erroneous. *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972). A finding of fact is clearly erroneous "when although there is evidence to support it, the reviewing court . . . is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

In 1970, the IRS audited the Club and determined that its gross receipts from nonmembers were in excess of 11, 16 and 17 percent of its total receipts, excluding initiation fees, for the fiscal years 1967, 1968, and 1969, respectively. It further determined that nonmember receipts in those three years totaled over $281,000. On the basis of this evidence, the Club's dealings with nonmembers were on the same proportions as those ruled impermissible in Revenue Ruling 60–324 [5] and also were outside the five percent safe harbor set by Revenue Procedure 64–36.[6] The IRS therefore revoked the Club's 1959 tax exemption ruling as of 1967, the first of the three years audited.

The district court, however, utilized its own "independent compilation" of 25 functions as the basis for its fact-findings. Its findings as to which of those 25 functions were for members and which were for nonmembers have no support in the record. Moreover, the court erred further in projecting the results of that compilation to the 3,500 functions held during the five years in question.

In order to understand the district court's error, we must first examine the Club's first survey. That survey purported to include the 25 highest cost functions held at the Club during the 1969 fiscal year. This court discussed the shortcomings of that survey in its second opinion:

> The first survey consisted of 20 responses out of 25 questionnaires sent to the PPC members who sponsored the 25 largest affairs in 1969. IRS had classified those 25 affairs as "outside." *See* 536 F.2d at 576 n. 11; note 4 *supra*. If the first survey is held admissible, and depending upon the weight accorded to it, it might then support the Club's argument for exemption. While the first survey may lack the principal disability of the second survey, *i. e.*, the objectionable cover letter, and may therefore be more trustworthy (less danger of insincerity), it nevertheless presents the same problems respecting members' faulty memories. We cannot help but observe that the first survey is also subject to objection by reason of its small sample size, its lack of a scientific sampling method, its use of stratified sampling, the possibility of a skew since only the largest functions were sampled, and the fact that the sample includes several banquets which the IRS classified

---

under Section 501(c)(7). 26 C.F.R. § 1.501(c)(7)–1(b).

**5.** In 1960, the IRS ruled that a social club was impermissibly engaging in business with the public by "making its facilities available for the use of outside organizations and groups through the member-sponsorship arrangement." Rev.Rul. 60–324, 1960–2 Cum.Bull. 173, 175. Under the "member-sponsorship arrangement," any member of a club may invite outside organizations and groups to use the club. Such outside groups typically either pay the club directly or reimburse the sponsoring member for the cost of the function. In Revenue Ruling 60–324, the social club's gross receipts from member-sponsored groups of nonmembers ranged between 12 and 17 percent of

the club's gross receipts over a seven-year period. Its tax exemption therefore was revoked for engaging in business with nonmembers.

**6.** Revenue Ruling 60–324 was followed in 1964 by Revenue Procedure 64–36, 1964–2 Cum. Bull. 962, which in 1971 was expanded and superseded by Revenue Procedure 71–17, 1971–1 Cum. Bull 683. In both Revenue Procedures, the IRS published a "safe-harbor" guideline for social clubs. That guideline provides that the IRS will not use gross receipts from nonmembers as an indication that a social club is engaged in business unless nonmember receipts exceed five percent of the club's gross receipts from all sources except initiation fees.

as "inside." Although we note these factors, we express no opinion as to the survey's admissibility or the weight it should be accorded if admitted, particularly since at the first trial it appears that the Government did not object to its introduction into evidence, or to the testimony of witnesses based upon it.

579 F.2d at 762 n.22.

Apart from this court's earlier observations regarding the survey's deficiencies, it was discovered upon the most recent remand that this survey did not include the 25 highest cost functions, but only seven of them. The district court quite properly did not base its findings upon it.

The district court erred, however, in attempting to reconstruct the survey *sua sponte*; the court retained seven of the functions from the first survey and added eighteen new functions. There is no record support for the district court's choices of which of the eighteen new functions were for members and which were for nonmembers. In justifying its decision, the court merely stated:

> The list of the top 25 ($750 and over) drawn from PX–C–4, schedules T–1 through T–21, shows a total billing of $30,056.90 and only 7 of the club's top 19 appear on this list.
>
> The 7 common items, amounting to $9926.52, and treated as inside income in the analysis of PX–13, will be so treated in the allocation of items in the new list. The $1103.45 item of W. H. Ferguson for Duff's Business school will be treated as outside income, like the $183.92 item for the same member in PX–13. Items of "special billing" where no member's name is given but merely the organization (Cromler-McCormick), $1480.55 and Institute of Architects $799.64, will be considered outside income. Don Malinger ($1837.50 and $1077.60) was apparently promoting his own business interests, and the same is true of James Shuman ($1643.34), Walter Bigham, Jr. ($1540.50), P. J. Beta ($1111.58), and E. H. Williamson ($766.60). Likewise the event sponsored by John McGovern for Mellon Institute would appear to be inside income

($1221.04). Richard Murphy's party for the Insurance Club of Pittsburgh is also to be treated as a business item ($1089.10).

> On the other hand, an item of $942.17 for Kaufmann's Glee Club would seem to be outside income. The lunch sponsored by Gloria Ferris ($846.48) was apparently for her own business purposes, as was a second item of M. Roberts for Sykes ($805.91) which should receive the same treatment as the earlier item in the club list ($1079.30).
>
> With respect to James Smith's dinner and luncheon for the Allegheny Bar Association ($1427.55 and $804.30), our personal view would be to regard this as a doubtful item (see 388 F.Supp. at 1276) but inasmuch as the Court of Appeals has not displayed an equally skeptical view of the IRS position which regards reimbursement as fatal to the claim of normal club use, we shall count the Smith items as outside income, since we can take judicial notice that members of the bar association pay their own way and only the newly-naturalized citizens, law school graduates being admitted to the bar, and divers dead-head judges are genuine guests in the IRS view of guest-host relationship. However, the events sponsored by Jack Spinks for L. B. Foster Co. ($877.67) and by Earl M. Keim for Duquesne Light ($755.66) are probably business-related.
>
> According to this allocation, in 1969 the inside business was $23,506.34, or 78.2 percent, and the outside business $6,557.66 or 21.8 percent.

462 F.Supp. at 325–326. (footnote omitted).

These determinations by the court on the nature of the activity appear to be made solely on the basis of the names of the individuals and organizations involved. The only evidence about the functions was supplied by the IRS agent who, after consulting with the Club's manager, classified them as nonmember functions. It was error for the court to conclude that a function was for members or nonmembers solely on the basis of the name of the sponsor where there was no factual evidence to support that conjecture.

Finally, it was error to project the results of the court's twenty five function "independent compilation" over the universe of 3,550 functions held during the five year period. The IRS Agent had examined carefully 1000 functions. The Club's manager agreed on the classification of all but twelve. The district court totally ignored this evidence. This was clearly erroneous.[7]

■ Section 1.501(c)(7)–1(b) of the Treasury Regulations provides that a club that engages in business, such as by making its facilities available to the public, is not exempt. 26 C.F.R. § 1.501(c)(7)–1(b). This court has held that this exemption is to be strictly construed. 536 F.2d at 576. We cannot reconcile $281,000 of nonmember receipts, representing 11 to 17 percent of gross receipts, $179,000 of net profits from nonmembers, and more than 800 nonmember functions with this policy of strict construction. We therefore hold that the Club was engaged in business and revocation of its exemption was proper.

### III.

■ We consider next the propriety of revoking the Club's tax exemption as of its 1967 taxable year which commenced June 1, 1966. The district court held that the revocation could be effective only after February 2, 1972 when the determination to revoke the Club's exemption became final. As we noted in the second appeal in this case, *Lesavoy Foundation v. Commissioner*, 238 F.2d 589 (3d Cir. 1956) makes it "difficult to uphold a retroactive revocation of PPC's exemption if the revocation were based on a determination that the Club's 1967–71 practices were materially different

from the representations contained in the 1956 exemption application as interpreted by IRS." 579 F.2d at 763 n.24. We therefore agree with the district court in not making the revocation retroactive. However, the revocation may take effect at the time the Club first had notice that its exemption might be revoked. *See* Rev.Proc. 72–4 section 11.01, 1972–1 Cum. Bull. 706, 708. This notice was given in 1970 with Agent Marcolini's audit report. Consequently the revocation shall be effective for the Club's taxable year 1971 (June 1, 1970– May 31, 1971).[8]

### IV.

For the foregoing reasons, the judgment of the district court will be reversed.

---

7. We recognize that the district court may have felt constrained by this court's prior opinion. This court's opinion in the second appeal instructed the district court not to "reopen the record or take additional evidence." 579 F.2d at 762. The Club was to rest on the evidence adduced in the two trials. Since the first survey had been admitted without objection by the Government, the district court may have believed that it could only rely on this evidence in making findings. Nevertheless, its findings of fact, in the face of the Government's evidence, were clearly erroneous. The only supportable conclusion on this record was that the Club had failed to satisfy its burden of proof.

8. Judges Gibbons and Sloviter agree that the revocation should be effective only for the Club's taxable year 1971. Judge Higginbotham would hold that the Commissioner did not abuse his discretion in revoking the Club's exemption as of the 1967 taxable year and that the district court erred in relying on *Lesavoy Foundation v. Commissioner*, 238 F.2d 589 (3d Cir. 1956) for the proposition that a revocation may be retroactive only if the taxpayer has shown bad faith.